# SOUTH FLORIDA WATER MANAGEMENT DISTRICT
## *v.* MICCOSUKEE TRIBE OF INDIANS ET AL.

No. 02–626.   Argued January 14, 2004—Decided March 23, 2004

96

*Timothy S. Bishop* argued the cause for petitioner. With him on the briefs were *Sheryl Grimm Wood* and *James E. Nutt.*

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorney General Sansonetti, Deputy Solicitor General Hungar, Deputy Assistant Attorney General Clark, James C. Kilbourne, Ellen Durkee,* and *Sylvia Quast.*

*Dexter W. Lehtinen* argued the cause for respondents. With him on the brief for respondent Miccosukee Tribe of Indians were *Juan M. Vargas, Claudio Riedi, Sonia Escobio O'Donnell, Richard J. Ovelmen,* and *Dionè C. Carroll. John E. Childe* filed a brief for respondent Friends of the Everglades.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Colorado et al. by *Ken Salazar,* Attorney General of Colorado, *Alan J. Gilbert,* Solicitor General, *Felicity Hannay,* Deputy Attorney General, and *An-*

Justice O'Connor delivered the opinion of the Court.

Petitioner South Florida Water Management District operates a pumping facility that transfers water from a canal

thony S. Trumbly, Senior Assistant Attorney General, by Patricia A. Madrid, Attorney General of New Mexico, Glenn R. Smith, Deputy Attorney General, and Stephen R. Farris, Assistant Attorney General, and by the Attorneys General for their respective States as follows: Mark J. Bennett of Hawaii, Lawrence Wasden of Idaho, Jon Bruning of Nebraska, Brian Sandoval of Nevada, Wayne Stenehjem of North Dakota, Lawrence E. Long of South Dakota, Greg Abbott of Texas, Mark L. Shurtleff of Utah, and Patrick J. Crank of Wyoming; for Idaho Governor Dirk Kempthorne by L. Michael Bogert; for the City of Weston, Florida, by Susan L. Trevarthen and Nancy E. Stroud; for the City of New York et al. by Michael A. Cardozo, Leonard J. Koerner, Kenneth A. Rubin, and Alexandra Dapolito Dunn; for the Florida Fruit and Vegetable Association et al. by Terry Cole, John J. Rademacher, and John W. Costigan; for the Lake Worth Drainage District et al. by Kenneth G. Spillias and Michelle Diffenderfer; for the National Association of Home Builders by Virginia S. Albrecht, Andrew J. Turner, Duane J. Desiderio, and Thomas Jon Ward; for the National Hydropower Association by Sam Kalen and Michael A. Swiger; for the National League of Cities et al. by Richard Ruda and James I. Crowley; for the National Water Resources Association et al. by Robert V. Trout, Peggy E. Montaño, Jeffrey Kightlinger, Gregory K. Wilkinson, Guy R. Martin, W. Patrick Schiffer, and Gregg A. Houtz; for the Nationwide Public Projects Coalition et al. by Lawrence R. Liebesman; for the Pacific Legal Foundation by Robin L. Rivett and Frank A. Shepherd; and for the Utility Water Act Group by Kristy A. N. Bulleit.

Briefs of amici curiae urging affirmance were filed for the State of New York et al. by Eliot Spitzer, Attorney General of New York, Caitlin J. Halligan, Solicitor General, Michelle Aronowitz, Deputy Solicitor General, Robert H. Easton, Assistant Solicitor General, Peter H. Lehner, Chief Assistant Attorney General, and James M. Tierney, Assistant Attorney General, and by the Attorneys General for their respective States as follows: Richard Blumenthal of Connecticut, Lisa Madigan of Illinois, Albert B. Chandler III of Kentucky, G. Steven Rowe of Maine, Thomas F. Reilly of Massachusetts, Michael A. Cox of Michigan, Jeremiah W. (Jay) Nixon of Missouri, Peter C. Harvey of New Jersey, Roy Cooper of North Carolina, W. A. Drew Edmondson of Oklahoma, William H. Sorrell of Vermont, and Christine O. Gregoire of Washington; for the Commonwealth of Pennsylvania Department of Environmental Protection by Richard P. Mather, Sr., Leslie Anne Miller, Peter G. Glenn, and K. Scott Roy; for the

into a reservoir a short distance away. Respondents Micco-sukee Tribe of Indians and the Friends of the Everglades brought a citizen suit under the Clean Water Act contending that the pumping facility is required to obtain a discharge permit under the National Pollutant Discharge Elimination System. The District Court agreed and granted summary judgment to respondents. A panel of the United States Court of Appeals for the Eleventh Circuit affirmed. Both the District Court and the Eleventh Circuit rested their holdings on the predicate determination that the canal and reservoir are two distinct water bodies. For the reasons explained below, we vacate and remand for further development of the factual record as to the accuracy of that determination.

## I

## A

The Central and South Florida Flood Control Project (Project) consists of a vast array of levees, canals, pumps, and water impoundment areas in the land between south Florida's coastal hills and the Everglades. Historically, that land was itself part of the Everglades, and its surface and ground water flowed south in a uniform and unchanneled sheet. Starting in the early 1900's, however, the State began to build canals to drain the wetlands and make them suitable for cultivation. These canals proved to be a source

Association of State Wetland Managers et al. by *Patrick A. Parenteau* and *Julia LeMense Huff;* for the Coalition of Greater Minnesota Cities et al. by *Douglas L. Skor;* for the Florida Wildlife Federation et al. by *David G. Guest* and *Monica K. Reimer;* for the National Tribal Environmental Council et al. by *Tracy A. Labin, Robert T. Anderson,* and *William H. Rodgers, Jr.;* for the National Wildlife Federation et al. by *James Murphy* and *Howard I. Fox;* for the Tongue & Yellowstone River Irrigation District et al. by *Jack R. Tuholske* and *Elizabeth A. Brennan;* for Trout Unlimited, Inc., et al. by *Karl S. Coplan;* and for Former Administrator of the United States Environmental Protection Agency Carol M. Browner et al. by *Richard J. Lazarus.*

of trouble; they lowered the water table, allowing saltwater to intrude upon coastal wells, and they proved incapable of controlling flooding. Congress established the Project in 1948 to address these problems. It gave the United States Army Corps of Engineers the task of constructing a comprehensive network of levees, water storage areas, pumps, and canal improvements that would serve several simultaneous purposes, including flood protection, water conservation, and drainage. These improvements fundamentally altered the hydrology of the Everglades, changing the natural sheet flow of ground and surface water. The local sponsor and day-to-day operator of the Project is the South Florida Water Management District (District).

Five discrete elements of the Project are at issue in this case. One is a canal called "C–11." C–11 collects ground water and rainwater from a 104-square-mile area in south central Broward County. App. 110. The area drained by C–11 includes urban, agricultural, and residential development, and is home to 136,000 people. At the western terminus of C–11 is the second Project element at issue here: a large pump station known as "S–9." When the water level in C–11 rises above a set level, S–9 begins operating and pumps water out of the canal. The water does not travel far. Sixty feet away, the pump station empties the water into a large undeveloped wetland area called "WCA–3," the third element of the Project we consider here. WCA–3 is the largest of several "water conservation areas" that are remnants of the original South Florida Everglades. The District impounds water in these areas to conserve freshwater that might otherwise flow directly to the ocean, and to preserve wetlands habitat. *Id.*, at 112.

Using pump stations like S–9, the District maintains the water table in WCA–3 at a level significantly higher than that in the developed lands drained by the C–11 canal to the east. Absent human intervention, that water would simply flow back east, where it would rejoin the waters of the canal

and flood the populated areas of the C–11 basin. That return flow is prevented, or, more accurately, slowed, by levees that hold back the surface waters of WCA–3. Two of those levees, L–33 and L–37, are the final two elements of the Project at issue here. The combined effect of L–33 and L–37, C–11, and S–9 is artificially to separate the C–11 basin from WCA–3; left to nature, the two areas would be a single wetland covered in an undifferentiated body of surface and ground water flowing slowly southward.

B

As the above description illustrates, the Project has wrought large-scale hydrologic and environmental change in South Florida, some deliberate and some accidental. Its most obvious environmental impact has been the conversion of what were once wetlands into areas suitable for human use. But the Project also has affected those areas that remain wetland ecosystems.

Rain on the western side of the L–33 and L–37 levees falls into the wetland ecosystem of WCA–3. Rain on the eastern side of the levees, on the other hand, falls on agricultural, urban, and residential land. Before it enters the C–11 canal, whether directly as surface runoff or indirectly as ground water, that rainwater absorbs contaminants produced by human activities. The water in C–11 therefore differs chemically from that in WCA–3. Of particular interest here, C–11 water contains elevated levels of phosphorous, which is found in fertilizers used by farmers in the C–11 basin. When water from C–11 is pumped across the levees, the phosphorous it contains alters the balance of WCA–3's ecosystem (which is naturally low in phosphorous) and stimulates the growth of algae and plants foreign to the Everglades ecosystem.

The phosphorous-related impacts of the Project are well known and have received a great deal of attention from state and federal authorities for more than 20 years. A number

of initiatives are currently under way to reduce these impacts and thereby restore the ecological integrity of the Everglades. Respondents Miccosukee Tribe of Indians and the Friends of the Everglades (hereinafter simply Tribe), impatient with the pace of this progress, brought this Clean Water Act suit in the United States District Court for the Southern District of Florida. They sought, among other things, to enjoin the operation of S–9 and, in turn, the conveyance of water from C–11 into WCA–3.

## C

Congress enacted the Clean Water Act (Act) in 1972. Its stated objective was "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 86 Stat. 816, 33 U. S. C. § 1251. To serve those ends, the Act prohibits "the discharge of any pollutant by any person" unless done in compliance with some provision of the Act. § 1311(a). The provision relevant to this case, § 1342, establishes the National Pollutant Discharge Elimination System, or NPDES. Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters. The Act defines the phrase "'discharge of a pollutant'" to mean "any addition of any pollutant to navigable waters from any point source." § 1362(12). A "'point source,'" in turn, is defined as "any discernible, confined and discrete conveyance," such as a pipe, ditch, channel, or tunnel, "from which pollutants are or may be discharged." § 1362(14).

According to the Tribe, the District cannot operate S–9 without an NPDES permit because the pump station moves phosphorous-laden water from C–11 into WCA–3. The District does not dispute that phosphorous is a pollutant, or that C–11 and WCA–3 are "navigable waters" within the meaning of the Act. The question, it contends, is whether the

operation of the S–9 pump constitutes the "discharge of [a] pollutant" within the meaning of the Act.

The parties filed cross-motions for summary judgment on the issue of whether S–9 requires an NPDES permit. The District Court granted the Tribe's motion, reasoning as follows:

> "In this case an addition of pollutants exists because undisputedly water containing pollutants is being discharged through S–9 from C–11 waters into the Everglades, both of which are separate bodies of United States water with . . . different quality levels. They are two separate bodies of water because the transfer of water or its contents from C–11 into the Everglades would not occur naturally." App. to Pet. for Cert. 28a–29a.

The Court of Appeals affirmed. It reasoned first that "in determining whether pollutants are added to navigable waters for purposes of the [Act], the receiving body of water is the relevant body of navigable water." 280 F. 3d 1364, 1368 (CA11 2002). After concluding that pollutants were indeed being added to WCA–3, the court then asked whether that addition of pollutants was from a "point source," so as to trigger the NPDES permitting requirement. To answer that question, it explained:

> "[F]or an addition of pollutants to be from a point source, the relevant inquiry is whether—but for the point source—the pollutants would have been added to the receiving body of water. We, therefore, conclude that an addition from a point source occurs if a point source is the cause-in-fact of the release of pollutants into navigable waters.
>
> "When a point source changes the natural flow of a body of water which contains pollutants and causes that water to flow into another distinct body of navigable water into which it would not have otherwise flowed,

that point source is the cause-in-fact of the discharge of pollutants." *Ibid.* (footnote omitted).

Because it believed that the water in the C–11 canal would not flow into WCA–3 without the operation of the S–9 pump station, the Court of Appeals concluded that S–9 was the cause-in-fact of the addition of pollutants to WCA–3. It accordingly affirmed the District Court's grant of summary judgment, and held that the S–9 pump station requires an NPDES permit. We granted certiorari. 539 U. S. 957 (2003).

## II

The District and the Federal Government, as *amicus*, advance three separate arguments, any of which would, if accepted, lead to the conclusion that the S–9 pump station does not require a point source discharge permit under the NPDES program. Two of these arguments involve the application of disputed contentions of law to agreed-upon facts, while the third involves the application of agreed-upon law to disputed facts. For reasons explained below, we decline at this time to resolve all of the parties' legal disagreements, and instead remand for further proceedings regarding their factual dispute.

## A

In its opening brief on the merits, the District argued that the NPDES program applies to a point source "only when a pollutant originates from the point source," and not when pollutants originating elsewhere merely pass through the point source. Brief for Petitioner 20. This argument mirrors the question presented in the District's petition for certiorari: "Whether the pumping of water by a state water management agency that adds nothing to the water being pumped constitutes an 'addition' of a pollutant 'from' a point source triggering the need for a National Pollutant Discharge Elimination System permit under the Clean Water Act." Pet. for Cert. i. Although the Government rejects

the District's legal position, Brief for United States as *Amicus Curiae* 21, it and the Tribe agree with the factual proposition that S–9 does not itself add any pollutants to the water it conveys into WCA–3.

This initial argument is untenable, and even the District appears to have abandoned it in its reply brief. Reply Brief for Petitioner 2. A point source is, by definition, a "discernible, confined, and discrete *conveyance.*" § 1362(14) (emphasis added). That definition makes plain that a point source need not be the original source of the pollutant; it need only convey the pollutant to "navigable waters," which are, in turn, defined as "the waters of the United States." § 1362(7). Tellingly, the examples of "point sources" listed by the Act include pipes, ditches, tunnels, and conduits, objects that do not themselves generate pollutants but merely transport them. § 1362(14). In addition, one of the Act's primary goals was to impose NPDES permitting requirements on municipal wastewater treatment plants. See, *e. g.,* § 1311(b)(1)(B) (establishing a compliance schedule for publicly owned treatment works). But under the District's interpretation of the Act, the NPDES program would not cover such plants, because they treat and discharge pollutants added to water by others. We therefore reject the District's proposed reading of the definition of " 'discharge of a pollutant' " contained in § 1362(12). That definition includes within its reach point sources that do not themselves generate pollutants.

### B .

Having answered the precise question on which we granted certiorari, we turn to a second argument, advanced primarily by the Government as *amicus curiae* in merits briefing and at oral argument. For purposes of determining whether there has been "any addition of any pollutant to navigable waters from any point source," *ibid.,* the Government contends that all the water bodies that fall within the Act's definition of " 'navigable waters' " (that is, all "the

waters of the United States, including the territorial seas," § 1362(7)) should be viewed unitarily for purposes of NPDES permitting requirements. Because the Act requires NPDES permits only when there is an addition of a pollutant "to navigable waters," the Government's approach would lead to the conclusion that such permits are *not* required when water from one navigable water body is discharged, unaltered, into another navigable water body. That would be true even if one water body were polluted and the other pristine, and the two would not otherwise mix. See *Catskill Mountains Chapter of Trout Unlimited, Inc.* v. *New York*, 273 F. 3d 481, 492 (CA2 2001); *Dubois* v. *United States Dept. of Agriculture*, 102 F. 3d 1273 (CA1 1996). Under this "unitary waters" approach, the S–9 pump station would not need an NPDES permit.

1

The "unitary waters" argument focuses on the Act's definition of a pollutant discharge as "any addition of any pollutant to navigable waters from any point source." § 1362(12). The Government contends that the absence of the word "any" prior to the phrase "navigable waters" in § 1362(12) signals Congress' understanding that NPDES permits would not be required for pollution caused by the engineered transfer of one "navigable water" into another. It argues that Congress intended that such pollution instead would be addressed through local nonpoint source pollution programs. Section 1314(f)(2)(F), which concerns nonpoint sources, directs the Environmental Protection Agency (EPA) to give States information on the evaluation and control of "pollution resulting from . . . changes in the movement, flow, or circulation of any navigable waters or ground waters, including changes caused by the construction of dams, levees, channels, causeways, or flow diversion facilities."

We note, however, that § 1314(f)(2)(F) does not explicitly exempt nonpoint pollution sources from the NPDES program if they *also* fall within the "point source" definition.

And several NPDES provisions might be read to suggest a view contrary to the unitary waters approach. For example, under the Act, a State may set individualized ambient water quality standards by taking into consideration "the designated uses of the navigable waters involved." 33 U. S. C. § 1313(c)(2)(A). Those water quality standards, in turn, directly affect local NPDES permits; if standard permit conditions fail to achieve the water quality goals for a given water body, the State must determine the total pollutant load that the water body can sustain and then allocate that load among the permit holders who discharge to the water body. § 1313(d). This approach suggests that the Act protects individual water bodies as well as the "waters of the United States" as a whole.

The Government also suggests that we adopt the "unitary waters" approach out of deference to a longstanding EPA view that the process of "transporting, impounding, and releasing navigable waters" cannot constitute an "'addition'" of pollutants to "'the waters of the United States.'" Brief for United States as *Amicus Curiae* 16. But the Government does not identify any administrative documents in which EPA has espoused that position. Indeed, an *amicus* brief filed by several former EPA officials argues that the agency once reached the opposite conclusion. See Brief for Former Administrator Carol M. Browner et al. as *Amici Curiae* 17 (citing *In re Riverside Irrigation Dist.*, 1975 WL 23864 (Ofc. Gen. Coun., June 27, 1975) (irrigation ditches that discharge to navigable waters require NPDES permits even if they themselves qualify as navigable waters)). The "unitary waters" approach could also conflict with current NPDES regulations. For example, 40 CFR § 122.45(g)(4) (2003) allows an industrial water user to obtain "intake credit" for pollutants present in water that it withdraws from navigable waters. When the permit holder discharges the water after use, it does not have to remove pollutants that were in the water before it was withdrawn. There is a

caveat, however: EPA extends such credit "only if the discharger demonstrates that the intake water is drawn from the same body of water into which the discharge is made." The NPDES program thus appears to address the movement of pollutants among water bodies, at least at times.

Finally, the Government and numerous *amici* warn that affirming the Court of Appeals in this case would have significant practical consequences. If we read the Act to require an NPDES permit for every engineered diversion of one navigable water into another, thousands of new permits might have to be issued, particularly by western States, whose water supply networks often rely on engineered transfers among various natural water bodies. See Brief for Colorado et al. as *Amici Curiae* 2–4. Many of those diversions might also require expensive treatment to meet water quality criteria. It may be that construing the NPDES program to cover such transfers would therefore raise the costs of water distribution prohibitively, and violate Congress' specific instruction that "the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired" by the Act. § 1251(g). On the other hand, it may be that such permitting authority is necessary to protect water quality, and that the States or EPA could control regulatory costs by issuing general permits to point sources associated with water distribution programs. See 40 CFR §§ 122.28, 123.25 (2003).*

---

*An applicant for an individual NPDES permit must provide information about, among other things, the point source itself, the nature of the pollutants to be discharged, and any water treatment system that will be used. General permits greatly reduce that administrative burden by authorizing discharges from a category of point sources within a specified geographic area. Once EPA or a state agency issues such a permit, covered entities, in some cases, need take no further action to achieve compliance with the NPDES besides adhering to the permit conditions. See 40 CFR § 122.28(b)(2)(v) (2003).

Indeed, that is the position of the one State that *has* interpreted the Act to cover interbasin water transfers. See Brief for Pennsylvania Department of Environmental Protection as *Amicus Curiae* 11–18.

## 2

Because WCA–3 and C–11 are both "navigable waters," adopting the "unitary waters" approach would lead to the conclusion that the District may operate S–9 without an NPDES permit. But despite its relevance here, neither the District nor the Government raised the unitary waters approach before the Court of Appeals or in their briefs respecting the petition for certiorari. (The District adopted the position as its own in its reply brief on the merits.) Indeed, we are not aware of any reported case that examines the unitary waters argument in precisely the form that the Government now presents it. As a result, we decline to resolve it here. Because we find it necessary to vacate the judgment of the Court of Appeals with respect to a third argument presented by the District, the unitary waters argument will be open to the parties on remand.

## C

In the courts below, as here, the District contended that the C–11 canal and WCA–3 impoundment area are not distinct water bodies at all, but instead are two hydrologically indistinguishable parts of a single water body. The Government agrees with the District on this point, claiming that because the C–11 canal and WCA–3 "share a unique, intimately related, hydrological association," they "can appropriately be viewed, for purposes of Section 402 of the Clean Water Act, as parts of a single body of water." Brief for United States in Opposition 13. The Tribe does not dispute that if C–11 and WCA–3 are simply two parts of the same water body, pumping water from one into the other cannot constitute an "addition" of pollutants. As the Second Cir-

cuit put it in *Trout Unlimited*, "[i]f one takes a ladle of soup from a pot, lifts it above the pot, and pours it back into the pot, one has not 'added' soup or anything else to the pot." 273 F. 3d, at 492. What the Tribe disputes is the accuracy of the District's factual premise; according to the Tribe, C–11 and WCA–3 are two pots of soup, not one.

The record does contain information supporting the District's view of the facts. Although C–11 and WCA–3 are divided from one another by the L–33 and L–37 levees, that line appears to be an uncertain one. Because Everglades soil is extremely porous, water flows easily between ground and surface waters, so much so that "[g]round and surface waters are essentially the same thing." App. 111, 117. C–11 and WCA–3, of course, share a common underlying aquifer. Tr. of Oral Arg. 42. Moreover, the L–33 and L–37 levees continually leak, allowing water to escape from WCA–3. This means not only that any boundary between C–11 and WCA–3 is indistinct, but also that there is some significant mingling of the two waters; the record reveals that even without use of the S–9 pump station, water travels as both seepage and ground water flow between the water conservation area and the C–11 basin. App. 172; see also *id.*, at 37 (describing flow between C–11 and WCA–3 as "cyclical").

The parties also disagree about how the relationship between S–9 and WCA–3 should be assessed. At oral argument, counsel for the Tribe focused on the differing "biological or ecosystem characteristics" of the respective waters, Tr. of Oral Arg. 43; see also Brief for Respondent Miccosukee Tribe of Indians 6–7; Brief for Respondent Friends of the Everglades 18–22, while counsel for the District emphasizes the close hydrological connections between the two. See, *e. g.*, Brief for Petitioner 47. Despite these disputes, the District Court granted summary judgment to the Tribe. It applied a test that neither party defends; it determined

that C–11 and WCA–3 are distinct "because the transfer of water or its contents from C–11 into the Everglades would not occur naturally." App. to Pet. for Cert. 28a. The Court of Appeals for the Eleventh Circuit endorsed this test. 280 F. 3d, at 1368.

We do not decide here whether the District Court's test is adequate for determining whether C–11 and WCA–3 are distinct. Instead, we hold only that the District Court applied its test prematurely. Summary judgment is appropriate only where there is no genuine issue of material fact. See *Celotex Corp.* v. *Catrett,* 477 U. S. 317 (1986). The record before us leads us to believe that some factual issues remain unresolved. The District Court certainly was correct to characterize the flow through the S–9 pump station as a nonnatural one, propelled as it is by diesel-fired motors against the pull of gravity. And it also appears true that if S–9 were shut down, the water in the C–11 canal might for a brief time flow *east,* rather than west, as it now does. But the effects of shutting down the pump might extend beyond that. The limited record before us suggests that if S–9 were shut down, the area drained by C–11 would flood quite quickly. See 280 F. 3d, at 1366 ("Without the operation of the S–9 pump station, the populated western portion of Broward County would flood within days"). That flooding might mean that C–11 would no longer be a "distinct body of navigable water," *id.,* at 1368, but part of a larger water body extending over WCA–3 and the C–11 basin. It also might call into question the Eleventh Circuit's conclusion that S–9 is the cause in fact of phosphorous addition to WCA–3. Nothing in the record suggests that the District Court considered these issues when it granted summary judgment. Indeed, in ordering later emergency relief from its own injunction against the operation of the S–9 pump station, the court admitted that it had not previously understood that shutting down S–9 would " 'literally ope[n] the flood gates.' " *Id.,* at 1371.

We find that further development of the record is necessary to resolve the dispute over the validity of the distinction between C–11 and WCA–3. After reviewing the full record, it is possible that the District Court will conclude that C–11 and WCA–3 are not meaningfully distinct water bodies. If it does so, then the S–9 pump station will not need an NPDES permit. In addition, the Government's broader "unitary waters" argument is open to the District on remand. Accordingly, the judgment of the United States Court of Appeals for the Eleventh Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring in part and dissenting in part.

I join Parts I and II–A of the Court's opinion, which hold that a point source is not exempt from the National Pollutant Discharge Elimination System permit requirement merely because it does not itself add pollutants to the water it pumps. I dissent, however, from its decision to vacate the judgment below on another ground, Part II–C, *ante,* and to invite consideration of yet another legal theory, Part II–B, *ante.* Neither of those actions is taken in response to the question presented. I would affirm the Court of Appeals' disposition of the question presented without reaching other issues.

Parts II–B and II–C are problematic for other reasons as well. In Part II–B, the Court declines to resolve the Government's unitary-waters argument on the ground that it was not raised or decided below. See *ante,* at 109. In my judgment, a fair reading of the opinion and briefs does not support that contention. See, *e. g.,* 280 F. 3d 1364, 1368, n. 5 (CA11 2002) ("We reject the Water District's argument that no addition of pollutants can occur unless pollutants are added from the outside world *insofar as the Water District contends the outside world cannot include another body of*

*navigable waters*" (emphasis added)); Brief for Appellant in No. 00–15703–CC (CA11), p. 10 ("The S–9 pump station merely moves navigable waters from one side of the Levee to another"). That the argument was not phrased in the same terms or argued with the same clarity does not mean it was not made. I see no point in directing the Court of Appeals to consider an argument it has already rejected.

I also question the Court's holding in Part II–C that summary judgment was precluded by the possibility that, if the pumping station were shut down, flooding in the C–11 basin might ultimately cause pollutants to flow from C–11 to WCA–3. *Ante,* at 111. To my knowledge, that argument has not previously been made. Petitioner argued that WCA–3 and C–11 were historically part of the same ecosystem and that they remain hydrologically related, see Brief for Petitioner 46–49, but that is quite different from arguing that, absent S–9, pollutants would flow from C–11 to WCA–3 (a journey that, at the moment, is *uphill*). Nothing in *Celotex Corp.* v. *Catrett,* 477 U. S. 317 (1986), requires a district court to speculate *sua sponte* about possibilities even the parties have not contemplated. Cf. Fed. Rule Civ. Proc. 56(e) (opponent of summary judgment must "set forth specific facts showing that there is a genuine issue for trial").

I would affirm the judgment below as to the question presented, leaving the Government's unitary-waters theory to be considered in another case.