**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ONRC ACTION,
            *Plaintiff-Appellant*,

v.

UNITED STATES BUREAU OF
RECLAMATION,
            *Defendant-Appellee*,

KLAMATH BASIN WATER USERS
ASSOCIATION; OREGON WATER
RESOURCES CONGRESS; KLAMATH
DRAINAGE DISTRICT,
   *Intervenor-Defendants–Appellees*.

No. 12-35831

D.C. No.
1:97-cv-03090-
CL

OPINION

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, Senior District Judge, Presiding

Argued and Submitted
November 21, 2014—Portland, Oregon

Filed August 21, 2015

Before: Richard R. Clifton, Milan D. Smith, Jr.,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Clifton

## SUMMARY[*]

### Clean Water Act

The panel affirmed the district court's summary judgment in favor of the United States Bureau of Reclamation and other defendants in a citizen suit brought by an environmental group under the Clean Water Act, alleging defendants violated the Act by discharging pollutants from the Klamath Straits Drain into the Klamath River without a permit.

The Clean Water Act limits the "discharge of pollutants," and makes unlawful the addition from a point source of any pollutant to navigable waters without a permit. The Klamath River is a navigable water. The Klamath Straits Drain moves water from Lower Klamath Lake back to the Klamath River, and is part of the Klamath Irrigation Project operated by the Bureau of Reclamation in parts of Oregon and California.

The panel held that because the waters flowing into the Klamath River from the Klamath Straits Drain were not "meaningfully distinct," as that term was used in *L.A. Cnty. Flood Dist. v. Natural Resources Defense Council*, 133 S. Ct. 710, 713 (2013) (holding that "no pollutants are 'added' to a water body when water is merely transferred between different portions of that water body"), a permit was not required under the Clean Water Act.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

William Charles Carpenter, Jr., Eugene, Oregon, for Plaintiff-Appellant.

David C. Shilton (argued), Katherine J. Barton, Kent E. Hanson, Austin David Saylor, and Robert G. Dreher, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for Defendant-Appellee United States Bureau of Reclamation.

Nicholas A. Jacobs (argued) and Paul Scott Simmons, Somach Simmons & Dunn, Sacramento, California, for Intervenor-Defendant–Appellee Klamath Basin Water Users Association.

Sarah Stauffer Curtiss and David E. Filippi, Stoel Rives LLP, Portland, Oregon, for Intervenor-Defendant–Appellee Oregon Water Resources Congress.

Justin E. Throne, Klamath Falls, Oregon, for Intervenor-Defendant–Appellee Klamath Drainage District.

Charlene Koski, United States Department of Justice, Office of the United States Attorney, Seattle, Washington; and Thomas P. Schlosser, Morisset, Schlosser, Jozwiak & Somerville, Seattle, Washington, for Amicus Curiae Hoopa Valley Tribe.

David G. Guest and Monica Reimer, Earthjustice, Tallahassee, Florida; Yinet Pino, Law Offices of Bernardo Roman III, Miami, Florida, for Amici Curiae Miccosukee Tribe of Indians of Florida, Friends of the Everglades, and Florida Wildlife Federation.

Philip Bein, Brian Sutherland, Richard Dearing, and Barbara Underwood, Office of the New York Attorney General, Albany, New York; Eric Schneiderman, Attorney General of New York, New York, New York, for Amici Curiae States of New York, Delaware, Maine, Missouri, Washington, and Province of Manitoba, Canada.

Roderick E. Walston, Best Best & Krieger, LLP, Walnut Creek, California, for Amici Curiae Westlands Water District and San Luis & Delta-Mendota Water Authority.

William Jenkins, Gavin G. McCabe, Robert W. Byrne, and Kamala D. Harris, Office of the California Attorney General, San Francisco, California, for Amicus Curiae State of California.

Annette Quill, Daniel Domenico, and John Suthers, Colorado Department of Law, Denver, Colorado; Catherine Cortez Masto, Attorney General, Carson City, Nevada, for Amici Curiae States of Colorado, Nevada, Alaska, Arizona, Idaho, Kansas, Nebraska, New Mexico, North Dakota, Texas, Utah, and Wyoming.

Peter D. Nichols, Berg Hill Greenleaf & Ruscitti LLP, Boulder, Colorado; Don Baur and Paul Smyth, Perkins Coie LLP, Washington, D.C., for Amici Curiae Western Urban Water Coalition; National Water Resources Association; The Metropolitan Water District of Southern California; The San Diego County Water Authority; The City and County of San Francisco Public Utilities Commission; The [California] State Water Contractors; The Eldorado Irrigation District; The Central Arizona Water Conservation District; the [Arizona] Salt River Project; The Metropolitan Water District, of Salt Lake & Sandy [Utah]; The Las Vegas Valley Water District;

The Idaho Water Users Association; The City of Aurora [Colorado]; The City of Boulder [Colorado]; The City of Colorado Springs, acting by and through its enterprise Colorado Springs Utilities; The City and County of Denver, acting by and through its Board of Water Commissioners; The Lower Arkansas Valley [Colorado] Water Conservancy District; The Central Utah Water Conservancy District; The Washington County [Utah] Water District; The Southeastern Colorado Water Conservancy District; The Kane County [Utah] Water Conservancy District; The Imperial Irrigation District [California]; The Rio Grande Water Conservation District; and The Republican River Water Conservation District.

## OPINION

CLIFTON, Circuit Judge:

This appeal presents the question of whether the Bureau of Reclamation has violated the Clean Water Act by discharging pollutants from the Klamath Straits Drain into the Klamath River without a permit. The Klamath Straits Drain is part of the Klamath Irrigation Project operated by the Bureau in parts of Oregon and California. Based on the factual record, we conclude that the waters transferred via the Drain to the Klamath River are not "meaningfully distinct" from the waters of the river itself, as that term was used in *Los Angeles County Flood Control Dist. v. Natural Resources Defense Council*, ___ U.S. ___, 133 S. Ct. 710, 713 (2013), and *South Florida Water Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95, 112 (2004). As a result, no permit is required. We affirm the judgment of the district court.

## I.    Background

The Klamath Irrigation Project ("the Project") was authorized by Congress in 1905.  Act of February 9, 1905, ch. 567, 33 Stat. 714 (codified at 43 U.S.C. § 601).  It covers territory in Oregon and California, providing irrigation services to about 210,000 acres of land through a complex system of dams, pumping plants, canals, laterals, tunnels, and drains.  The Project service area also encompasses four wildlife refuges: the Lower Klamath Refuge, Tule Lake Refuge, Clear Lake Refuge, and Upper Klamath Refuge.

The Project initially draws water from the Klamath River and Upper Klamath Lake.  A series of conveyances provides the water for use on the surrounding land and connects it with the waters of the Lost River Basin, which prior to the Project was a separate water system.  From there, the waters and additional runoff are conveyed via a tunnel through the mountain into Lower Klamath Lake.  The Klamath Straits Drain moves water from Lower Klamath Lake back to the Klamath River.

Before the engineering of the Project, Lower Klamath Lake and the Klamath River were connected by the Klamath Straits.  Generally, water would flow in the spring from the Klamath River through the Straits and into Lower Klamath Lake. The flood waters would eventually recede and reduce the flood marshes around Lower Klamath Lake back to their original size.  The Straits thus served to connect the River and Lake.

For a period of time early in the 20th Century, that link was severed.  In 1909, a railroad company built an embankment across the Klamath Straits.  The embankment

included headgates that, if closed, would block the natural flow through the Straits. Starting in 1915, settlers in the area pushed for closure of the headgates in order to drain their lands. Their lobbying effort succeeded, and in 1917 the headgates were closed, severing the historic connection between Lower Klamath Lake and the Klamath River.

In the 1940's, however, the Bureau restored the link. As noted earlier, the Project moves water from the Klamath River and the Lost River Basin, along with runoff added along the way, into Lower Klamath Lake. There was no outlet for the added waters from Lower Klamath Lake, and that lake could not contain all the extra water volume. Instead of simply opening the headgates, the Bureau decided to control the flow of water by making improvements that essentially followed the historic path of the Straits. It excavated and channelized the Straits and some of the nearby marshland, turning it into what is now called the Klamath Straits Drain ("KSD").

The KSD is about 8.5 miles in length. It originates in Lower Klamath Lake and follows a straight, channelized path, first north and then northwest across what was once marshland between Lower Klamath Lake and the Straits. It eventually turns and hits the historic footprint of the Straits 1.5 miles northwest of the historic confluence between the Straits and Lower Klamath Lake. It then essentially follows the path of the Straits to the Klamath River.

There are two pumping stations along the route of the KSD that keep water flowing from Lower Klamath Lake to the Klamath River. After the water passes through the second pumping station, it flows via gravity for two miles to the point of confluence with the Klamath River. The pumping

stations are not always active. They are used to keep the water elevation level in the KSD within a certain operating range.

Plaintiff ONRC Action is an environmental group based in Oregon. It filed this action as a citizen suit under section 505(a) of the Clean Water Act, ("CWA"), 33 U.S.C. § 1365(a). ONRC contends that the Bureau and other Defendants violated the CWA by discharging pollutants from the KSD into the Klamath River without a permit.

The CWA limits the "discharge of pollutants," a term broadly defined by the Act to mean, in relevant part, "any addition of any pollutant to navigable waters from any point source." *Or. Nat. Desert Ass'n v. Dombeck* ("ONDA"), 172 F.3d 1092, 1095–96 (9th Cir. 1998) (quoting 33 U.S.C. § 1362(12)), *cert. denied*, 528 U.S. 964 (1999). "Point source" is broadly defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). While the Act recognizes that nonpoint source pollution also contributes to the degradation of water quality, it "provides no direct mechanism to control nonpoint source pollution." *ONDA*, 172 F.3d at 1097.

The CWA makes unlawful the addition from a point source of any pollutant to navigable waters without a permit. 33 U.S.C. § 1311(a). The Klamath River is a navigable water. Plaintiff contended that Defendants were discharging pollutants via the KSD into the River without a permit and without taking the necessary steps to mitigate the discharge

of pollutants as required under such a permit.  Defendants argued that a permit was not required to operate the KSD.

The Defendants filed a motion for summary judgment, and Plaintiff filed a cross-motion for partial summary judgment.  A magistrate judge issued a Report and Recommendation that recommended granting summary judgment in favor of the Defendants and denying partial summary judgment for the Plaintiff.  The recommendation was based on conclusions that the discharge of water from the KSD to the Klamath River was exempted from the requirement for a permit under the CWA by the Water Transfers Rule adopted by the Environmental Protection Agency, 40 C.F.R. § 122.3(I), and that adoption of the Rule was properly within the EPA's authority.  The district court adopted the Report and Recommendation and entered summary judgment in favor of Defendants.

Plaintiff timely appealed.

## II. Discussion

In reviewing a summary judgment, we apply the same standard as the district court, determining whether there are any genuine disputes of material facts, viewing the evidence in the light most favorable to a nonmoving party.  *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004).  We may affirm summary judgment on any ground supported in the record.  *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 956 (9th Cir. 2009).

After the district court entered its decision in this case, the Supreme Court issued its opinion in *Los Angeles County Flood Control Dist. v. Natural Resources Defense Council*,

___ U.S. ___, 133 S. Ct. 710 (2013), providing a simpler path to resolving this appeal.[1]  In that case, the Supreme Court considered the question of whether "the flow of water out of a concrete channel within a river rank[s] as a 'discharge of a pollutant'" under the CWA.  *Id.* at 711.  The Court answered that question in the negative.  It held that "pumping polluted water from one part of a water body into another part of the same body is not a discharge of pollutants under the CWA," *id*. at 711, citing to its prior decision in *South Florida Water Management Dist. v. Miccosukee Tribe*, 541 U.S. 95, 109–12 (2004).    The *L.A. County Flood Control* decision acknowledged that "storm water is often heavily polluted." 133 S. Ct. at 712.  Nonetheless, it is the addition of pollutants from a point source that is prohibited under the CWA, and the Court held that "no pollutants are 'added' to a water body when water is merely transferred between different portions of that water body."  *Id*. at 713.  A water transfer counts as a discharge of pollutants under the CWA only if the two separate bodies of water are "meaningfully distinct water bodies."  *Id.* (quoting *Miccosukee*, 541 U.S. at 112).

The record in this case demonstrates that the waters of the KSD are not meaningfully distinct from those of the Klamath River.  Determining whether waters are meaningfully distinct is a factual undertaking.  *See Miccosukee Tribe*, 541 U.S. at 110–12.

While the facts here are not exactly like those in *L.A. County Flood Control*, there are significant similarities.  Like

---

[1] As a result, we do not reach the questions of whether the discharge of water from the KSD to the River was exempted by the Water Transfers Rule, and whether adoption of that Rule was properly within the EPA's authority.

the channelized riverbed in *L.A. County Flood Control*, the KSD is essentially an improved version of a previously existing natural waterway, the Straits. The KSD restored a longstanding hydrological connection that was interrupted by human intervention when the headgates were closed in 1917, but that connection was restored more than 70 years ago. The KSD generally follows the historic footprint of the Straits, which connected Lower Klamath Lake to the Klamath River, and where it deviates it passes through marshland that also provided a historical hydrological connection.

In addition, as noted above, much of the water that flows through the KSD originated from the Klamath River itself. The general flow of water in the Project is from the Klamath River, through the various parts of the Project, into Lower Klamath Lake, and back to the Klamath River via the KSD. The water is combined with other waters, notably waters from the Lost River Basin, from spring-fed streams and presumably from runoff like the storm water added to the river channels involved in *L.A. County Flood Control*. Still, it is evident that a substantial portion of the waters returned to the Klamath River by the KSD initially came from the Klamath River itself.

To be sure, the KSD is not simply a replacement for a historical natural connection. The KSD uses two pumping stations to maintain the water level and ensure the flow of water into the Klamath River, although the pumps are not in operation at all times. But there was a pump used to link different water bodies against the flow of gravity in *Miccosukee Tribe*, and that did not mean that those bodies of water had to be considered meaningfully distinct. 541 U.S. at 110–11.

In considering whether the KSD was a navigable water covered by the CWA, the district court found that "the [KSD], like the Klamath Straits, creates a hydrological connection between the Klamath River and Lower Klamath Lake." It went on to find that if the headgates and the pumps were removed, it would be possible for water to flow between the Klamath River and Lower Klamath Lake. Those waters are not meaningfully distinct.

## III.    Conclusion

As the waters flowing into the Klamath River from the KSD are not meaningfully distinct, a permit is not required under the CWA. We affirm the summary judgment entered by the district court in favor of Defendants.

**AFFIRMED**.