RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0240p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

EA MANAGEMENT; WILLIAM ELIAS,
                           *Plaintiffs-Appellants,*

          *v.*

JP MORGAN CHASE BANK, N.A.,
                           *Defendant-Appellee.*

No. 09-2464

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-11629—Avern Cohn, District Judge.

Argued: December 3, 2010

Decided and Filed: August 26, 2011

Before: MARTIN, GIBBONS, and KETHLEDGE, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Jamie K. Warrow, NEUMAN ANDERSON, P.C., Southfield, Michigan, for Appellants. Jason P. Klingensmith, DICKINSON WRIGHT PLLC, Detroit, Michigan, for Appellee. **ON BRIEF:** Jamie K. Warrow, Leif K. Anderson, Kenneth F. Neuman, NEUMAN ANDERSON, P.C., Southfield, Michigan, for Appellants. Jason P. Klingensmith, Toby A. White, DICKINSON WRIGHT PLLC, Detroit, Michigan, for Appellee.

_____

### OPINION

_____

KETHLEDGE, Circuit Judge. William Elias sued JP Morgan Chase Bank after Chase refused to honor three cashier's checks that Chase thought Elias had obtained by fraud. The district court granted summary judgment to Chase as to all of Elias's claims, finding among other things that Chase had reason to believe that Elias actually did commit fraud. Elias argues before us that the question whether he committed fraud is

"disputed." We conclude that, under the Uniform Commercial Code as enacted in Michigan, Chase's actions were lawful even absent any finding of fraud. So we affirm.

I.

In 2005, Elias worked with Direct Lending, a Michigan lender and broker in the subprime-mortgage business. In that capacity, he had signatory authority for Direct Lending's bank accounts at Chase. Direct Lending revoked that authority in September 2006, which is when Elias left the company. Elias alleges that he was part owner of Direct Lending and that the company agreed to buy out his interest for $600,000. Direct Lending responds that it agreed to pay Elias an unspecified amount in severance, but that he owned no interest in the company. Either way, in October 2005 Direct Lending issued Check No. 2253 for $100,000 to EA Management, an assumed name used by Elias. He deposited the check into his account at LaSalle Bank, but the check bounced on October 4, 2006. LaSalle debited Elias's account $100,000 for the dishonored check and $5 as a returned-check fee, for a total of $100,005.

On October 9, 2006, Direct Lending issued Check No. 2275 in the amount of $100,005 to EA Management. The parties dispute whether this check was issued as a replacement for No. 2253; the check's amount strongly suggests it was, but Elias insists it was not—making this the first of several remarkable coincidences under his view of the facts of this case. For the most part we are constrained to accept his view for purposes of this appeal. After receiving Check No. 2275, Elias opened a new account at Chase, deposited the check into it, and immediately withdrew $88,000.

Almost three months later—on December 26, 2006, at 5:53 p.m.—Elias visited a Chase branch in Canton, Michigan. There he deposited two instruments. The first was Check No. 2253—the same check that had bounced more than two months before. The second was a starter check (No. 99993), which Elias had signed and made out to himself in the amount of $80,000. That check was dated five months earlier, *i.e.*, July 26, 2006—which, again coincidentally, was back when Elias had signing authority for Direct Lending's accounts. Elias says he forgot about the check for five months after he wrote it. Another explanation—the one advanced by Chase—is that Elias made out

the check on or around December 26 and backdated it to the same date in July. That explanation gains traction from the undisputed fact that the *preceding* check in the starter registry—No. 99992—was dated August 11, 2006, which is more than two weeks *after* Check No. 99993 was dated. But again we are constrained to accept Elias's story on this point.

Prior to these deposits, Elias's balance with Chase was $12,005. With them—assuming the checks cleared—his balance would rise to $192,005. Elias sought to withdraw $190,000 from his account on the spot, but the bank refused.

Later that night, someone shifted funds between several of Direct Lending's accounts with Chase. The apparent result of those transfers was that the accounts on which Check No. 2253 and the starter check were drawn, respectively, had sufficient funds to cover them. Although the fact of the transfers is not disputed, the identity of the person who shifted the funds is. Direct Lending says that person was Elias. Elias himself says nothing about the subject—making this, at best, the Mount Everest of coincidences in this case.

In any event, at 9:30 the next morning, Elias went to a different Chase branch—in Livonia—and asked for three cashier's checks totaling $191,251.31. This time he received them, likely because of the account transfers the night before. At Elias's request, two of the cashier's checks were made payable to third parties, Green Tree and Mortgage Service Center, to pay off mortgages on Elias's home. Those two checks totaled $121,251.31. The remaining $70,000 cashier's check was payable to Elias himself.

Hours later, Direct Lending's treasurer, Tina Shukeireh, discovered that "there had been several transfers done [between Direct Lending's accounts], early in the morning[.]" She testified that she "had not done" those transfers. Shukeireh also noticed that Elias had deposited Check No. 2253 and the starter check for payment. She immediately notified Chase that Elias was not authorized to sign or cash either check, and that the overnight transfers between Direct Lending's accounts were fraudulent.

Shukeireh also ordered Chase to stop payment on both checks. Chase complied with that order.

Chase then unwound its transactions with Elias. First, it debited $180,000 (the total for both of the checks he had deposited) from Elias's account and credited that same amount to Direct Lending's account. That left Elias's account with an negative balance of $179,298.31. Second, Chase dishonored all three cashier's checks.

Elias's own bank statement shows that on February 28, 2007, Chase credited Elias's account in the amount of $191,251.31. (More on that below.) That same date, Elias withdrew the remaining funds and closed his account at Chase.

On March 6, 2007, Elias sued Chase in Wayne County, Michigan, alleging that Chase had wrongfully dishonored the three cashier's checks, causing him damages exceeding $191,251.31. Chase removed the action to federal court and thereafter moved to dismiss Elias's claims. The district court granted the motion. This appeal followed.

## II.

We review the district court's dismissal of Elias's claims de novo. *See Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 503-04 (6th Cir. 2006). For the most part, Elias argues that the district court decided a genuine issue of material fact—namely, whether Elias obtained the cashier's checks by fraud—when it dismissed his claims. But we can affirm on any basis supported by the record. *See Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002). We choose to determine first whether there is a basis here for affirmance independent of fraud.

## A.

Elias's complaint included a claim under the Uniform Commercial Code (UCC or Code) as enacted in Michigan. Elias has cited the wrong sections of the Code throughout this litigation, but his argument essentially is that Chase lacked authority to dishonor the three cashier's checks that it issued at Elias's request on December 27, 2006. So we proceed to analyze whether Chase's actions were lawful under the Code.

First, Chase was entirely within its rights—and indeed its obligations—when it complied with Direct Lending's order to stop payment on Check No. 2253 and the $80,000 starter check (the "deposited checks"). Chase was both the payor bank and the depository bank for these checks. *See* M.C.L. § 440.4105(b), (c). Direct Lending issued the stop-payment order to Chase (in its capacity as payor bank) on the morning after Elias had deposited the checks with Chase. Elias does not allege in his complaint that any of the events recited in M.C.L. § 440.4303(1) had occurred by that time, which for our purposes means that the stop-payment order was timely. Chase was therefore correct to comply with the order, and indeed could have been liable to Direct Lending if it had not. *See id.* § 440.4403(1), (3).

That Chase stopped payment on the deposited checks in its capacity as the payor bank means that it did not get paid for those checks in its capacity as the depository bank. And that in turn knocks the bottom out of Elias's claim that Chase was required to honor the cashier's checks. A cashier's check is a negotiable instrument. *See id.* § 440.3104(3), (6). Article 3 of the Code applies to negotiable instruments. *Id.* § 440.3102(1). Section 440.3305—which is part of Article 3 as enacted in Michigan—provides that "the right to enforce the obligation of a party to pay an instrument is subject to[,]" among other things, "[a] defense of the obligor stated in another section of this article or a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract." *Id.* § 440.3305(1)(b). (Some holders in due course are not subject to those defenses, *see id.* § 440.3305(2); but Elias does even not allege that he is a holder in due course with respect to the cashier's checks.)

Lack of consideration is a defense available to "[t]he drawer or maker of an instrument" under M.C.L. § 440.3303(2). Chase was the drawer of the cashier's checks, *see* M.C.L. § 440.3104(7); and § 440.3303(2) is part of the same "article" as § 440.3305(1)(b), which means the defense is available to Chase in this action, so long as Chase can prove it. Lack of consideration is also a defense to a contract claim under Michigan law. *See* M.C.R. 2.111(F)(3)(a); *Sherman v. DeMaria Bldg. Co.*, 513 N.W.2d

187, 191 (Mich. Ct. App. 1994). And that defense would be available to Chase if Elias were seeking to enforce a simple contract here. When Elias deposited Check No. 2252 and the $80,000 starter check, Chase credited his account $180,000. Elias used that credit to purchase the cashier's checks on December 27, 2007. But Chase reversed the $180,000 credit after it stopped payment on the deposited checks. Elias does not argue that Chase's reversal of that credit was itself unlawful under the Code. And the fact of that reversal means that—as a matter of law—Chase was not paid for the $191,251.31 of cashier's checks that it issued at Elias's request. That in turn means that Chase's obligation to pay the cashier's checks was not supported by consideration, which finally means that Elias cannot enforce that obligation here. *See* M.C.L. § 440.3305(1)(b).

Two other points bear mention. The first is that Elias is not entitled to enforce two of the cashier's checks in the first place. A bank is liable for a cashier's check only to "a person entitled to enforce" the instrument. M.C.L. §§ 440.3412, .3411(2). A person is entitled to enforce an instrument if he is the holder of the instrument, a nonholder in possession of the instrument with the rights of a holder, or a person otherwise entitled to enforce the instrument under UCC sections 3-309 or 3-418. M.C.L. § 440.3301. Elias is none of these things with respect to the cashier's checks made out to Green Tree and Mortgage Service Center, respectively. That is another ground for affirming the district court's judgment with respect to those checks.

The second point is that Elias has not suffered any damages as a result of Chase's refusal to pay the cashier's checks. As noted above, on February 28, 2007—two months after it refused to pay the cashier's checks—Chase credited $191,251.31 to Elias's account, which is the same amount, to the penny, of the sum of the cashier's checks. That credit restored Elias to the same position he was in when he walked through the doors of Chase's Livonia branch office on December 27. And that means Elias has no damages as a result of Chase's refusal to pay the cashier's checks, at least as measured by his December 27 transactions with Chase as a whole. What Elias seeks in this litigation, in short, is a windfall in the amount of $191,251.31, for which he has not provided Chase a penny of consideration. His claims are frivolous.

B.

Elias's lack of any damages also scythes down his common law claims. And we offer some additional reasons why those claims are meritless. Regarding his breach of contract claim, Elias contends that Chase breached his account agreement with him "by allowing Direct Lending to stop payment on the Cashier's Checks and by failing to hold the disputed funds in [Elias's] account." Elias Br. at 42. But Direct Lending did not stop payment on the *cashier's* checks; rather, it stopped payment on the *deposited* checks, on which Direct Lending was the putative drawer (putative, because Direct Lending says it was only a drawer by means of Elias's fraud). Suffice it to say that nothing in Elias's account agreement forbade Chase from complying with a timely stop-payment order from another customer with respect to checks drawn on that customer's account. Nor is there anything in Elias's agreement that obligated Chase to pay him $180,000 on the spot when he deposited Check No. 2253 and the starter check—particularly under the circumstances present here.

Finally, Elias argues that he has a viable negligence claim because Chase breached its "duty to conduct itself reasonably in banking transactions." Elias Br. at 43. That claim is very likely "displaced by the UCC[,]" since it "relate[s] to the Bank's handling of the [cashier's] checks." *Donovan v. Bank of Am.*, 574 F. Supp. 2d 192, 200 (D. Me. 2008). And relatedly—for the reasons explained above—there is not a shred of evidence that Chase acted unreasonably with respect to its actions here. All of the relevant evidence, instead, is to the contrary.

The district court's judgment is affirmed.