RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0047p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

SOUTH SIDE QUARRY, LLC; JASON LEE STANFORD,

          *Plaintiffs-Appellants*,

    *v.*

LOUISVILLE & JEFFERSON COUNTY METROPOLITAN SEWER DISTRICT,

          *Defendant-Appellee*.

> No. 21-5389

Appeal from the United States District Court for the Western District of Kentucky at Louisville.
No. 3:18-cv-00706—David J. Hale, District Judge.

Decided and Filed:  March 11, 2022

Before:  SILER, COLE, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  John D. Cox, Petersen S. Thomas, LYNCH, COX, GILMAN & GOODMAN, PSC, Louisville, Kentucky, for Appellants.  Adam T. Goebel, Adam C. Reeves, STOLL KEENON OGDEN PLLC, Louisville, Kentucky, for Appellee.

───────────────

## OPINION

───────────────

NALBANDIAN, Circuit Judge.  This case tells a tale of two creeks.  The first, Pond Creek, drains into a watershed highly prone to flooding.  The second, Fishpool Creek, diverts excess stormwater from that watershed into Vulcan Quarry through a channel maintained by the Louisville & Jefferson County Metro Sewer District.  For the owner of Vulcan Quarry—South Side LLC—Fishpool Creek's diversion created only the worst of times.  According to South

Side, Metro Sewer District used the diversion channel to flood and pollute Vulcan Quarry, all in violation of the Clean Water Act and Kentucky state law.

Metro Sewer District responded that the diversion channel connecting Fishpool Creek and Vulcan Quarry is part of a flood control project that was planned and constructed years ago. And that South Side knew this when it bought the property. According to Metro Sewer District, this meant that some of South Side's claims were time-barred. It also contended that South Side failed to give it sufficient notice of the pollution problems before suing.

The district court sided with Metro Sewer District and dismissed South Side's claims. For the following reasons, we affirm its decision.

I.

A.

*The Clean Water Act's Framework*. Congress enacted the Clean Water Act (CWA) to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Nat'l Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580, 582 (6th Cir. 1988) (quoting 33 U.S.C. § 1251). To reach this goal, the CWA encompasses a "comprehensive statutory system for controlling water pollution." *Id.* The "cornerstone" of this system is the National Pollution Discharge Elimination System (NPDES) permit program. *Nat. Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 108 (D.C. Cir. 1987); *see also* 33 U.S.C. § 1342. With a permit, a person may discharge pollutants so long as he stays within the permit's limits. But without a permit, a "discharge . . . [is] unlawful." 33 U.S.C. § 1311(a).

The CWA's permit program relies on "cooperative federalism" to manage "the nation's water resources." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 502 (2d Cir. 2017) (internal quotations omitted). To this end, it affirms that states "typically control the NPDES permitting programs as they apply to waters within their borders, subject to EPA approval." *Id.* at 502 (citing 33 U.S.C. §§ 1314(i)(2), 1342(b)–(c)). In the same vein, the CWA preserves states' "primary responsibilities and rights" to "allocate quantities of water within [their] jurisdiction." 33 U.S.C. §§ 1251(b), (g). This cooperative model is found in the

state of Kentucky. There, the Kentucky Natural Resources and Environmental Protection Cabinet issues Kentucky Pollution Discharge Elimination System (KPDES) permits for waters within the Commonwealth. *See* 48 Fed. Reg. 45497-02 (Oct. 6, 1983); 401 Ky. Admin. Reg. 5:050 (2007); *see also Ky. Waterways All. v. Johnson*, 540 F.3d 466, 470 (6th Cir. 2008).

Together, the CWA and the KPDES permits create a patchwork of "effluent limitations" that limit the discharge of pollutants. *See* 33 U.S.C. § 1362(11). These effluent limitations "restrict the quantities, rates, and concentrations" of pollutants discharged by a permit holder. *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (citing 33 U.S.C. §§ 1311, 1314). If a person discharging a pollutant fails to meet an effluent limitation or standard found in a regulation or permit—or fails to get a permit—he violates the CWA. When violations occur, the EPA and the states form the first line of defense. They retain the "primary" power to "enforce[]" the CWA. *Askins v. Ohio Dep't of Agric.*, 809 F.3d 868, 875 (6th Cir. 2016).

In limited circumstances, though, the CWA also permits citizen suits. *See* 33 U.S.C. § 1365. Such suits "serve[] only as backup, 'permitting citizens to abate pollution when the government cannot or will not command compliance.'" *Askins*, 809 F.3d at 875 (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 62 (1987)). Citizen suits must allege a violation of "an effluent standard or limitation" in the CWA. *See* 33 U.S.C. § 1365(a)(1).

But before a potential plaintiff can file a citizen suit, he must "strictly comply with statutory conditions precedent to suit." *Cooper v. Toledo Area Sanitary Dist.*, 797 F. App'x 920, 926 (6th Cir. 2019) (Kethledge, J., concurring) (alterations omitted) (quoting *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 28 (1989)). In the context of the CWA, that condition takes the form of a notice requirement. The notice requirement mandates that a plaintiff give the purported polluter warning of his intent to sue and of the alleged violation. *See* 33 U.S.C. § 1365(b)(1)(A).

With this framework in mind, we turn to the dispute in this case.

B.

*Factual Background.*   In 1996, Congress gave its stamp of approval to a stormwater diversion system in Jefferson County, Kentucky.  *See* Water Resources Development Act of 1996, Pub. L. No. 104-303, 110 Stat. 3658.  The system, researched and designed by the United States Army Corps of Engineers, created a flood-control scheme for Pond Creek.  Pond Creek drained into a large watershed in the Louisville area.  This watershed had the potential to cause widespread flooding and millions of dollars of damage.  The Corps' plan proposed to preempt the flooding with a network of detention basins, channels, roads, and wetland restoration.

One of the network's key components involved a Pond Creek tributary, Fishpool Creek, and a nearby basin, Vulcan Quarry.  Fishpool Creek ran close to the edge of Vulcan Quarry.  During storms, the quarry flowed downstream and into Fishpool Creek.  This caused flooding problems for the nearby residential areas.

The Corps' plan suggested that a more formal connection between the quarry and the creek would fix the problem.  Excess stormwater from Fishpool Creek would flow into a short diversion channel during periods of heavy rainfall.  That channel then would fill Vulcan Quarry through a spillway.  After the flooding subsided, the floodwater would drain back into Fishpool Creek through a pipe.  This project would "rechannel" Fishpool Creek and turn the quarry into the creek's "detention basin."  (R. 11-2, PageID 161, 169.)

The Corps partnered with Louisville & Jefferson County Metro Sewer District (MSD) to complete the project.  The Corps would design and construct Fishpool Creek's diversion channel.  MSD, for its part, would obtain the property rights needed for the project and maintain the system.

With the partnership in place, MSD went about acquiring the property rights to Vulcan Quarry.  First, it tried to negotiate with Vulcan Quarry's owners.  But those talks quickly broke down.  The parties disagreed about the price of a potential easement and the conditions attached to it. One specific point of contention?  Water quality.  The quarry's owners wanted MSD to prevent water contamination and clean up any pollution.  MSD responded that the project was a "storm water project," not a "sanitary sewer water treatment project."  (R. 11-6, PageID 220.)

So there would be "no treatment" or "monitoring" of the "water quality" once the diversion channel was complete. (*Id.*)

With negotiations at a stalemate, MSD filed an eminent domain action in the Jefferson Circuit Court. But instead of requesting an easement, MSD asked the court for the full title to Vulcan Quarry.

The court split the difference between the MSD and the owners. It awarded MSD an easement instead of the whole property. But it refused "to place conditions"—like water treatment obligations—on the easement. (R. 1-1, PageID 57.) Instead, the court recognized that the channel and spillway diverting Fishpool Creek would "affect the whole" of Vulcan Quarry. (R. 11-6, PageID 229.) The water that entered the Quarry would naturally include "debris wash" and "whatever the water picks up." (*Id.*) The resulting "flowage easement" gave MSD the "perpetual right, power, privilege and easement permanently to overflow, flood and submerge" Vulcan Quarry. (R. 11-7, PageID 233.)

After checking the easement off its list, MSD moved to the next step: acquiring a stream construction permit from the Kentucky Natural Resources and Environmental Protection Cabinet (the Cabinet). This permit gave MSD approval to construct a "diversion structure to direct floodwater" into the quarry. (R. 11-8, PageID 237.) But like the easement, the permit didn't condition its approval on a promise to treat the water or clean up any pollutants.

With the easement and permit in hand, the Corps began construction and completed the project in 2000. For the next 12 years, excess stormwater flowed from Fishpool Creek into Vulcan Quarry without issue.

This status quo changed when South Side LLC bought Vulcan Quarry in 2012. South Side disliked that a diversion channel connected its new quarry to Fishpool Creek. So with the ink barely dry on the deed, it took legal action and filed a motion in the long-closed eminent domain proceeding. This motion sought to hold MSD in contempt of the order that awarded the easement in the first place. South Side alleged that MSD had exceeded its easement by diverting all of Fishpool Creek—"rain or shine"—into Vulcan Quarry. (R. 11-13, PageID 486.) This perpetual flooding, it complained, amounted to a permanent taking of Vulcan Quarry.

MSD responded that the scope of the easement was "an entirely separate claim from one of contempt." (R. 11-13, PageID 503.) Soon after, South Side dropped the action.

*Procedural History.* Five years later, South Side tried a new litigation strategy. This time, it wanted to bring MSD into federal court using the CWA. So on July 27, 2018, South Side sent MSD notice of its intent to sue. The notice rehashed many of South Side's claims about the scope of the easement. MSD, it complained, had "permanently diverted" a "significant portion of Fishpool Creek" into Vulcan Quarry. (R. 1-1, 43.) And South Side contended this diversion exceeded the property right limitations—like volume limitations and water discharge limitations—implicit in the easement.

The notice also included new accusations of septic pollution. South Side claimed the water coming over the spillway "changed to a '[feces]-smelling murky brown'" around 2014. (*Id.* at 40.) After some testing, South Side had found that the "E. coli, coliform and fecal matter levels" in the quarry "'were off the charts high.'" (*Id.* at 40.) Together, the excess wastewater and pollution showed MSD used "Vulcan Quarry as a gigantic septic tank/settling pond/dewatering pond/debris filter." (*Id.* at 37.)

All in all, South Side's notice alleged that MSD's discharge of stormwater and pollutants violated the CWA's "general prohibition on the dumping of pollutants into U.S. waters," the easement, a Consent Decree, and various Kentucky-issued permits. (*Id.* at 44–48.) Those permits included the Stream Construction Permit (described above), MSD's stormwater discharge permit (called the MS4 permit), and MSD's wastewater treatment permits. As for the Consent Decree, it came about in 2005 when the Cabinet, the EPA, and MSD agreed to a series of steps designed to reduce the effects of combined and sanitary sewer overflows.

After it sent the notice, South Side sued. Its complaint included six counts of CWA violations, along with several state law claims for trespass, nuisance, and the like. MSD responded with a motion to dismiss for failure to state a claim.

The district court granted MSD's motion. The court bifurcated South Side's complaint into two distinct kinds of pollution claims: (1) pollution via excess wastewater and (2) pollution via sewage. It dismissed the excess wastewater claims as time-barred under the five-year statute

of limitations. *See* 24 U.S.C. § 2462. South Side, it noted, had brought excess stormwater claims against MSD in the 2013 contempt proceedings. The district court found these claims showed South Side knew about its potential CWA claim more than five years earlier. As for the sewage claims, the district court dismissed those because South Side didn't give MSD sufficient notice about the pollution problem before it filed suit. It found that South Side's notice had failed to (1) identify sewage as a pollutant, (2) provide dates the pollution took place, and (3) describe the source of the pollution.[1]

South Side appealed.

## II.

We review de novo a district court's decision on a Rule 12(b)(6) motion to dismiss. *Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018). To survive a motion to dismiss, a plaintiff can't make conclusory allegations that the defendant violated the law and leave it at that. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, the complaint must present "sufficient factual matter" to support a "plausible" inference of wrongdoing. *Id.* (citation omitted).

Because our review is de novo, we may affirm the district court's decision "for any reason in the record, including alternative grounds raised below and here." *Tschappatt v. Crescent Metal Prods.*, 798 Fed. App'x 887, 890 (6th Cir. 2020) (citing *EA Mgmt. v. JP Morgan Chase Bank, N.A.*, 655 F.3d 573, 575 (6th Cir. 2011)).

## III.

This case turns on whether South Side satisfied the CWA's pre-suit notice requirement.[2] Recall that the CWA permits citizen suits for alleged violations of an "effluent standard or

---

[1]After dismissing the federal claims, the district court declined to exercise supplemental jurisdiction over South Side's state law claims and dismissed them without prejudice. On appeal, South Side does not contest this aspect of the district court's decision.

[2]We decide this case on notice grounds alone. This is because South Side's claims are likely not time-barred. If South Side had sued MSD for excess wastewater pollution or an analogous claim in 2013, the statute of limitations might bar its CWA claims. But we are not so sure that it did. South Side's attempt to hold MSD in contempt instead seems to be a suit of a different stripe.

limitation," which, in this case, means KPDES permits or conditions of those permits. *See* 33 U.S.C. § 1365(a)(1); *see also City of Highland Park. v. EPA*, 817 F. App'x 42, 46–47 (6th Cir. 2020). Similarly, the CWA's pre-notice provision requires the plaintiff provide "sufficient information to permit the recipient to identify the *specific* standard, limitation, or order alleged to have been violated." 40 C.F.R. § 135.3(a) (emphasis added). The notice must include other information as well, including "the activity alleged to constitute a violation," "the person or persons responsible," and the "location" and "dates" of the violation. *Id.*

The purpose of this detailed description? To allow the alleged violator to identify any violation, bring its conduct into compliance with the law, and avoid the suit. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987); *see also Sierra Club v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 504 F.3d 634, 644 (6th Cir. 2007) (stating a plaintiff's pre-suit notice should "contain sufficient information to allow Defendants to identify all pertinent aspects of its [alleged] violations without extensive investigation").

One last note. Satisfying the pre-suit notice requirement is a "mandatory condition precedent to bringing a citizen suit." *Cooper*, 797 F. App'x at 923 (citing *Hallstrom*, 493 U.S. at 31). If a plaintiff fails to provide sufficient notice, a district court "must dismiss the action as barred" under the CWA. *Atl. States Legal Found., Inc., v. United Musical Instruments*, 61 F.3d 473, 478 (6th Cir. 1995); *see also Greene v. Reilly*, 956 F.2d 593, 594 (6th Cir. 1992) (explaining that "the notice requirement is not a mere technical wrinkle of statutory drafting or formality to be waived by the federal courts" (citation omitted)).

Here, most of South Side's CWA claims rest on violations of existing regulations, permits, or property rights. But South Side also bases its CWA suit on a permit that doesn't exist. It claims MSD needed—and failed—to obtain a KPDES permit specific to the Vulcan

---

In the contempt proceedings, South Side never mentioned wastewater, excess wastewater, or any kind of pollution. Rather, its claims focused on the construction flaws in the diversion channel. These flaws caused floodwater to enter the quarry and never drain out properly. In South Side's view, this meant MSD overburdened the easement, trespassed, and "misappropriated" a property "interest in the Quarry Property through a permanent taking." (R. 11-13, PageID 486–87.) True, South Side repeats many of these property-based arguments in its pre-suit notice. But that doesn't change the fact that pollution, much less wastewater pollution, did not play a role in the 2013 contempt proceedings. And since South Side's satisfaction of the notice requirement decides this case, we need not decide whether some of its claims were time-barred anyway.

Quarry detention basin. This dichotomy means the outcome of South Side's citizen suit turns on two corresponding inquiries. First, whether MSD's diversion system violated a specific standard, limitation, or order found in an existing KDPES permit. And second, whether MSD failed to obtain a KPDES permit specific to its operation of the diversion system. We consider each in turn.

A.

In its pre-suit notice, South Side mentions six potential "standards, limitations, or orders" that could serve as the basis for its CWA citizen suit. These are: (1) MSD's easement; (2) MSD and the Corps' Stream Construction Permit; (3) the Consent Decree between MSD, the EPA, and the Kentucky Cabinet; (4) agreements about upstream point sources; (5) the Clean Water Act's general prohibition on the discharge of pollutants; and (6) MSD's various KPDES permits.[3]

Each of the bases South Side relies on suffers from one of two problems. Some bases—like the easement, the Stream Construction Permit, and the Consent Decree—can't sustain a CWA citizen suit in the first place. Others—like the KPDES permits—could serve as the basis of a CWA claim. The problem? South Side never identifies a permit-specific "effluent standard or limitation" that MSD violated. This means South Side strikes out on each if its potential bases for a CWA suit.

*The Easement.* South Side believes that MSD has long violated the "property right limitations" found in its easement for Vulcan Quarry. (R.1-1, PageID 40.) Those limitations, it claims, include restrictions on water "volume," "triggering event[s]," the "duration" of floodwater storage, and "water discharges" from upstream developments. (*Id.*)

---

[3]As a general rule, we only consider matters within the pleadings when ruling on a 12(b)(6) motion. This review includes documents "attached to the pleadings." *Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007). And it also extends to documents "referred to in the pleadings" if those documents are "integral" to the plaintiff's "claims." *Id.* at 335–36. South Side attached its pre-suit notice to the complaint. The documents mentioned in the notice—like the various permits, the easement, and the Consent Decree—are "integral" to South Side's CWA claims against MSD. So we may consider them here without "converting [MSD's] motion to dismiss into one for summary judgment." *Id.* at 336.

To start, the source of these enumerated, property-right limitations is unclear. MSD's flowage easement, after all, gave it the "perpetual right, power, privilege and easement permanently to overflow, flood and submerge" Vulcan Quarry. (R. 11-7, PageID 233.) The Jefferson Circuit Court also refused to attach any conditions—including conditions related to the treatment of pollutants—to MSD's use of the quarry. South Side's notice lists no other source for the property-right limitations it reads into the easement.

But even if South Side could point to a textual source for the easement's limitations on water volume and storage, it still would come up short. Why? The easement is simply not an "effluent standard or limitation" under the CWA. South Side's argument to the contrary goes as follows: the easement contains implicit limitations on MSD's use of the quarry; MSD violates those limits; those limits are somehow incorporated into unnamed KPDES permits; MSD is violating those permits; so MSD is violating the CWA. (*See, e.g.*, R. 1, PageID 18 ("MSD is in violation of the Clean Water Act because its diversion of Fishpool Creek, in excess of the Easement is in excess of any permit, which must be limited by the Easement, and is therefore in excess of limitations of the CWA.").)

This conclusory logic cannot satisfy the notice requirement. South Side points to no KPDES permit that incorporates the easement or even mentions Vulcan Quarry. And it cites no Kentucky regulation connecting property rights, like an easement, with the CWA. In short, South Side offers no theory as to how MSD's use of the flowage easement could serve as the basis of CWA claim. South Side's references to the easement and "property right limitations" would in no way allow MSD or the EPA to detect and resolve any alleged violation.

*The Construction Permit.* South Side's attempt to invoke MSD and the Corps' Stream Construction Permit follows a similar path. MSD, it alleges, acted in bad faith when it applied for a "Stream Construction Permit" to create "the Vulcan Quarry Detention Basin." (R. 1-1, PageID 44.) Because of that bad faith, South Side claims MSD's use of the quarry is a "permanent taking" that somehow violates Kentucky-issued "permits" and the CWA. (*Id.* at 43.)

South Side's inclusion of the Stream Construction Permit moves it no closer to identifying a specific standard, limitation, or order MSD might have violated. True, a

subdivision of the Cabinet—the Kentucky Department of Water—granted MSD the Stream Construction Permit. But the permit itself is not a KPDES permit subject to EPA enforcement or control. Instead, the Cabinet issued the permit using its "exclusive" authority to regulate the construction of "dams . . . or other obstructions across or along any stream." Ky. Rev. Stat. § 151.250(3). So the Stream Construction Permit cannot serve as the basis for a CWA suit.

*The Consent Decree.* The Consent Decree perhaps presents a closer call than the easement or Stream Construction Permit. The EPA, the Cabinet, and MSD entered the original Consent Decree in 2005 and an amended version in 2009. The agreement described the steps MSD would take to reduce and mitigate the effects of sanitary sewer overflows, combined sewer overflows, and other discharges. (*Id.* at 350, 406). The plan implementing those steps, also found in the Consent Decree, continues through 2024. The Consent Decree, unlike the easement and Stream Construction Permit, addresses effluent limitations and standards found in the CWA and KPDES permits. But South Side's notice fails to describe a single provision of the Consent Decree that relates to Vulcan Quarry or that MSD has violated since it entered the agreement.

What's more, even if South Side did identify a specific provision, it would lack standing to enforce the Consent Decree anyway. The terms of the Consent Decree expressly reserve the right of enforcement to the EPA, the Cabinet, and MSD. Besides, we have long held that only parties to a consent decree may enforce its terms in a collateral proceeding. *Vogel v. City of Cincinnati*, 959 F.2d 594, 598 (6th Cir. 1992). This enforcement limitation holds true even for "intended third-party beneficiaries." *Aiken v. City of Memphis*, 37 F.3d 155, 168 (6th Cir. 1994); *see also Sanders v. Republic Servs. of Ky., LLC*, 113 F. App'x 648, 650–51 (6th Cir. 2004) (holding that the plaintiffs lacked standing to enforce a Consent Decree through a CWA citizen suit). So South Side, who is not a party to the Consent Decree, cannot use the agreement to satisfy the notice requirement.

*Agreements about Upstream Point Sources*. South Side claims "MSD [] improperly authorized point sources upstream of Vulcan Quarry." (R. 1-1, PageID 44.) To this end, South Side alleges MSD "engaged in agreements with owners of multiple tracts upstream of Vulcan Quarry." (*Id.* at 43.) Those agreements supposedly contemplated that the tract owners would

use Vulcan Quarry as some sort of septic system. (*Id.*) Although this allegation relates to Vulcan Quarry and point-source pollution, South Side fails to tie its general charge to anything specific. The notice doesn't list the tracts of land involved, the owners who made the agreements with MSD, the location of these polluting point sources, or any effluent limitation or standard that might apply. So its reference to these agreements moves it no closer to hitting the notice target.

*The CWA*. South Side's notice contends that MSD is violating the CWA's "general prohibition on the dumping of pollutants into U.S. waters." (*Id.* at 47–48.) It cites 33 U.S.C. § 1311, which prohibits the "discharge of any pollutant by any person" without a permit, to make its point. *See also* 33 U.S.C. § 1342. But the CWA's citizen-suit provision doesn't authorize citizen suits for violating some general prohibition. Instead, it authorizes suits for violating "effluent standard[s] or limitation[s]" found in the CWA or orders about those standards and limitations. *See Askins*, 809 F.3d at 872–73. As South Side itself notes, MSD has multiple KPDES permits authorizing the treatment and discharge of stormwater and wastewater. But without a specific allegation that MSD violated a permit's effluent standards or limitations, South Side can't satisfy the notice requirement, much less make out a CWA claim. *Accord* 33 U.S.C. § 1342(k) ("[C]ompliance with a permit issued pursuant to [the NPDES program] shall be deemed compliance, for purposes of [citizen suits], with sections 1311, 1312, 1316, 1317, and 1343."). So South Side's appeal to the CWA's "general prohibition," without more, can't bypass the notice requirement and move South Side past the citizen-suit starting line.

*KPDES Permits*. South Side's notice describes three KPDES permits applicable to MSD: (1) the MS4 permit; (2) the Morris Forman Waste Water Treatment Facility permit; and (3) the General KPDES Stormwater Construction Permit. KPDES permits, unlike the sources listed above, can serve as the basis for a CWA suit. But South Side's inclusion of these permits only gets it halfway there. This is because its notice doesn't identify any "specific standard[s], limitation[s], or order[s]" in the KPDES permits that MSD violated. *See* 40 C.F.R. § 135.

Start with the MS4 permit. MSD operates Jefferson County's Municipal Separate Storm Sewer System (known as an MS4 system). It receives a KPDES permit, called the MS4 permit,

to do so. The MS4 permit lists detailed requirements about the discharge of pollutants in the MS4 system. South Side's notice claims that MSD's MS4 permit for stormwater discharge expired in 2004 and hasn't been renewed since. According to South Side, this means MSD is "dumping pollution in Vulcan Quarry in violation of its MS4 permit." (R. 1-1, PageID 45.)

Contrary to South Side's assertion, MSD's most recent MS4 permit went into effect in 2017 and expires in 2022. But even if South Side did point to the updated MS4 permit in its notice, the result would be the same. The notice omits any mention of an effluent standard or limitation that MSD violated.

Next, the wastewater treatment permits. South Side asserts that the Commonwealth "has issued" KPDES permits to MSD for "the 27 waste water treatment facilities" under MSD's control. (R. 1-1, PageID 46.) It cites only one of those permits—the Morris Forman Waste Water Treatment Facility—by name. (*Id.* at 47.) But this brief reference makes up the whole of South Side's allegation. The notice describes no specific provision in any of the wastewater treatment permits with which MSD failed to comply.

Last, the General KPDES Stormwater Construction Permit. The Cabinet's Division of Water issues a general permit authorizing the discharge of stormwater pollutants during construction activities. South Side cites an expired version of that permit. Then it points out that the permit requires the permittee "to take all reasonable steps to minimize or prevent discharges." (*Id.* at 47.) But like its references to the MS4 permit and the wastewater treatment permits, South Side never explains how the permit's provisions relate to MSD and Vulcan Quarry.

\* \* \*

In sum, South Side's notice didn't identify a single "specific standard, limitation, or order" in an existing KPDES permit that MSD violated. *See* 40 C.F.R. § 135. Without that information, MSD cannot identify its violation, correct it, and bring its conduct into compliance with the CWA. So at least for any alleged violations of MSD's current KPDES permits, South Side has failed to satisfy the notice requirement.

B.

Next, we turn to South Side's remaining assertion: MSD is diverting Fishpool Creek into Vulcan Quarry "without [a] permit." (R. 1-1, PageID 44.) MSD, South Side claims, needs a "NPDES or KPDES permit to use Vulcan Quarry." (*Id.* at 45.) And MSD, it concludes, is "diverting and redirecting Fishpool Creek into Vulcan Quarry . . . without sufficient permits." (*Id.* at 47.) In essence, South Side believes MSD needs a KPDES permit specific to Vulcan Quarry before it can rechannel water from Fishpool Creek, along with whatever pollutants that water contains.

First, as a factual matter, we note that MSD didn't receive a KPDES permit when it first built the Fishpool Creek diversion system. The Cabinet didn't demand otherwise. Instead, MSD only needed a stream construction permit. The Cabinet issued that permit. And it didn't require MSD to obtain a separate KPDES water treatment permit before the Corps could start construction.

Second, as a legal matter, the CWA doesn't sweep every water diversion project into its permitting scheme. And MSD's rechanneling of Fishpool Creek is just the kind of water allocation system that falls outside the CWA's regulatory ambit. To begin, the diversion system isn't the kind of discharge that needs a permit under the CWA. But even if the opposite were true, the EPA's Water Transfer Rule would exempt the channel system from the permit requirement.

*Discharge*. The CWA specifically regulates the "discharge" of pollutants. 33 U.S.C. § 1311(a). It defines "discharge" to mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). "Navigable waters," for its part, includes "the waters of the United States." *Id.* § 1362(7).

In *South Florida Water Management District v. Miccosukee Tribe*, 541 U.S. 95, 109–112 (2004), the Supreme Court elaborated on the CWA's discharge definition. *Miccosukee* dealt with a pumping facility that transferred polluted water from a canal into a nearby reservoir. *Id.* at 98–99. The Court held that the pumping of polluted water between "two parts of the same water body" was not a discharge under the CWA. *Id.* at 109. Its reasoning focused on whether

the canal and the reservoir were "meaningfully distinct" bodies of water. *Id.* at 112. If so, the flow of water between the two would count as a discharge and require a NPDES permit. *Id.* But if not, no permit was required.

The Court reiterated *Miccosukee*'s explanation of "discharge" in *Los Angeles County Flood Control District v. Natural Resources Defense Council, Inc.*, 568 U.S. 78, 80 (2013). In that case, it considered water that flowed from a river, into a concrete channel, and then back into the same river. *Id.* at 80–82. The Court concluded that "no discharge of pollutants occurs when water, rather than being removed and then returned to a water body, simply flows from one portion of the water body to another." *Id.* at 83. Looking to the text of the CWA, the Court reasoned that "under a common understanding of the meaning of the word 'add,' no pollutants are 'added' to a water body when water is merely transferred between different" parts. *Id.* at 82; *see also ONRC Action v. U.S. Bureau of Reclamation*, 798 F.3d 933, 936–38 (9th Cir. 2015) (holding that the flow of water from a lake, through two pumping stations and man-made straights, and into a river was not between "meaningfully distinct" bodies of water).

MSD analogizes to *L.A. County* and *Miccosukee*. The flow of Fishpool Creek into Vulcan Quarry and then back into Fishpool Creek, it argues, is not a discharge because the creek and the quarry are not meaningfully distinct bodies of water. We agree.

Start with the Corps' original flood-control plan, which explained that the diversion channel would turn Vulcan Quarry into a "detention basin" for Fishpool Creek. (R 11-2, PageID 161.) This system, the Corps made clear, would "basically [] rechannel[]" Fishpool creek into the quarry and redirect "70% of annual runoff in the Pond Creek Basin." (*Id.* at 169–70.) Also consider the Corps' recent jurisdictional-determination letter, which South Side requested and then cited in its notice and complaint. In the letter, the Corps concludes that Vulcan Quarry is an "impoundment of relatively permanent water (Fishpool Creek)." (*Id.*)

Together, the Corps' original plan and its recent letter show that the waters of Fishpool Creek and Vulcan Quarry are part of the same body of water. Vulcan Quarry, after all, is a permanent impoundment of the creek. "Polluted water from one part of a water body"—Fishpool Creek—flows into "another part of the same body"—Vulcan Quarry—and then back

into Fishpool Creek again. *See L.A. Cnty. Flood Control*, 568 U.S. at 83. Because "no pollutants are added to a water body when water is merely transferred between different parts," Fishpool Creek does not "discharge" water into Vulcan Quarry. *Id.* at 82 (internal quotation marks omitted). Instead, Fishpool Creek moves from its stream bed, into its detention basin, and then back to the creek. The waters flowing into Fishpool Creek, in other words, are not meaningfully distinct from the waters sitting in Vulcan Quarry. Without meaningfully distinct waters, there is no discharge under the CWA. And without a discharge, MSD doesn't need a KPDES permit to rechannel Fishpool Creek into Vulcan Quarry.

*Water Transfer.* Assume for the sake of argument that Vulcan Quarry and Fishpool Creek are separate bodies of water. Even then, MSD still would not need a KPDES permit under the EPA's Water Transfer Rule.

A "water transfer" is an "activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use." 40 C.F.R. § 122.3(i). Such transfers "take a variety of forms," *Catskill*, 846 F.3d at 503, routing "water through tunnels, channels, and/or natural stream[s]" for uses like "irrigation, power generation, [and] flood control." Water Transfer Rule, 73 Fed. Reg. at 33,698. The EPA has long "taken a passive approach to regulating water transfers." *Catskill*, 846 F.3d at 503–04. And it formalized this policy when it adopted the Water Transfers Rule in 2008. That rule exempts water transfers from the NPDES permitting system. *See* 40 C.F.R. § 122.3(i).

The EPA's hands-off approach to water transfers aligns with the CWA's emphasis on "cooperative federalism." *Catskill*, 846 F.3d at 502. Remember that the CWA preserves states' "primary responsibilities and rights" to "allocate quantities of water within [their] jurisdiction." 33 U.S.C. § 1251(g). In line with this authority, almost every state with NPDES permitting authority likewise exempts water transfers. Water Transfer Rule, 73 Fed. Reg. at 33,699; *see also Catskill*, 846 F.3d at 504 n.12 (noting Pennsylvania is the only NPDES permitting authority that regularly issues NPDES permits for water transfers).

The Fishpool Creek diversion channel falls within the Water Transfer Rule. The short channel and spillway that connect Fishpool Creek and Vulcan Quarry "convey[] . . . waters of

the United States." 40 C.F.R. § 122.3(i). And those waters are not subject to any "intervening industrial, municipal, or commercial use." *Id.* The diversion channel, in other words, is the kind of water transfer or allocation generally exempt from the EPA's permitting system. That the water might contain pollutants or flow between potentially distinct bodies of water makes no difference. Because the diversion channel comes with the EPA's water-transfer exclusion, MSD does not require a permit to use Vulcan Quarry as a detention basin.

\* \* \*

South Side's notice claimed MSD violated the CWA when it diverted Fishpool Creek "without [a] permit." (R. 1-1, PageID 44.) But South Side's notice was wrong. MSD did not need a KPDES permit when it first built the channel between Fishpool Creek and Vulcan Quarry, and it doesn't need one now. The waters of Fishpool Creek and Vulcan Quarry are not meaningfully distinct. And the diversion channel connecting the two is the kind of water transfer that's exempt from the permitting process anyway. So like the other bases of South Side's CWA suit, the allegation that MSD lacked a KPDES permit also misses the notice mark.

IV.

For these reasons, we affirm the district court's judgment.